Next case for argument is 24-2228, Manufacturing Resources v. Squires. Good morning, Your Honors. May it please the Court. There's an error that flows across both the prior findings here and the secondary considerations. That is the Board's failure to consider all the evidence. That's a legal error. And what it results in is factual determinations that are not supported by substantial evidence. And so I'll begin with NAH briefly and then move to the secondary considerations, if I may. So in relation to NAH, specification of NAH throughout the specification and the figures discloses embodiments that have through holes through the bottom plate, which the bottom plate is the back of the casing. It also says you might have the holes only on the sides. You could have the sides, yes. It says you could do both. It gives you options. And the other thing is every claim in NAH that recites through holes recites through holes through the bottom plate. So if you look at, for example, Appendix 17-3. But the question is what the whole document teaches. Right. That's exactly the question, Your Honor. And so there's no evidence in the record that suggests that the Board looked at any of the additional disclosures in NAH. That's the legal error. But it results in factual findings that have no support in the record. And so, for instance, the Board relies, as we probably went on ad nauseum, on the one clause and one sentence in NAH that says it's sort of a catch-all, that you could put holes anywhere. The very next sentence, however, clarifies that. It says, that is, the through holes may be formed on a bottom plate and in any one or more of the first to fourth side walls. This is in the appendix at 17-24. And the Board admits that this renders the entire passage ambiguous. This is in their decision to appendix 38. So even if the Board were correct that that passage is ambiguous and in some way supports their finding, that's not enough to provide a motivation to one of skill in the art to make the proposed modification to NAH in which the bottom plate has no through holes. And so for that reason, I think the decision could be reversed. But at the very least, the decision should be vacated. Can I just ask you a basic question? I would have thought, let's just set aside the implication of the last sentence that you said, the that is sentence. If a reference expressly says, in another embodiment, you could have the holes only formed in the side walls, that's an express disclosure. It's not a modification of the prior art reference, right? That's true. I think your example, but the Board's findings were on appendix 34, that the constricted convection channel is only taught based on the modification of NAH that Samsung proposed. So maybe the right way to say it is not using the word modification, which actually does seem like the wrong word. NAH teaches both things, holes in the bottom, no holes in the bottom. Two different teachings express teachings. So the word modification seems wrong, but it's not wrong in a way that helps you. So I think modification is the right word. I think what's clear from the Board's decision is they found that NAH didn't disclose a bottom plate with no holes. And so on appendix 34, they were forced to rely on a modification of NAH, the one that Samsung proposed. And that becomes even more clear when you look at appendix page 38. They say, although the two sentences in the passage may be somewhat ambiguous, when read together, we find that the express statement, to your point, Judge Toronto, that through holes may be formed only in the first to fourth side walls supports petitioner's proposed modifications to exclude through holes. So I think what they're saying, and artfully, is that would provide the motivation for one of the skill in the art to make the modification that Samsung proposed because it's not in NAH. So I don't think they went as far as you're suggesting. That seems, I mean, very odd to me. That sentence in the passage, which Judge Stoll was pointing to, expressly contemplates holes in the bottom or no holes in the bottom. So when the board uses the word modification, perhaps you could sort of justify it by saying that the main illustration in NAH has holes in the bottom, so you can modify the illustration, but you're not modifying the teaching. And so you don't need to get into all of the section 103 standard about modifying the teaching of one piece of prior art. If they had made that finding, one, you're right, but they didn't make that finding. It's not in the record. There's still no evidence that they consider the reference as a hole. So there's nothing in the record that suggests that they looked at the figures, at the specification, at the claims, and considered that in their analysis. And they're required to do that under the case law in regards to RSA Farms. So by virtue of that, the fact finding, even if they had made that finding, and there's no evidence in here that they said it was an anticipation. Essentially, it was disclosed. They said you had to have a modification. Can I ask you in response to the very point you just made, what about the sentence on page 838, the last one of the very paragraph we've been talking about, where they say, after they talk about modification in Mr. Gershwitz's testimony, they say, we also decline to narrowly read this passage, which is referring back to the specification, as only supporting exclusion of through holes from the sidewalls, because a person of ordinary skill is also a person of ordinary creativity, not an automaton, albeit that's a sentence that's taken from KSR. You also read the specification from the point of a person of ordinary skill in the art. Right, but they're only addressing the one sentence, and they're still relying on the KSR. There's a passage. I think they're relying on the two sentences together. Yes, the two sentences together. The ambiguous passage, right. And they made the finding that it's ambiguous. What did you say? They said the finding? No, they said, although the two sentences in this passage might be somewhat ambiguous when read together, that's what they said. I don't think that's a finding that it's ambiguous. Is it? Well, what it is is a finding. If they could look at just the sentence, one sentence, in the specification without referencing anything else in the patent, there's nothing else there. I don't think there's enough to support the modification. I don't think it's express disclosure, but perhaps it's more supportable than what they actually did, which is they continued to look at NAH, which is what they should have done. They went to the second sentence, and they said when we look at those two sentences together, the passage is somewhat ambiguous, but we still find support. They say it might be somewhat ambiguous. I'm just saying it. I just don't want to overstate it. I understand. I read that as it's ambiguous. It might be ambiguous as opposed to it's clear. I think it's a difference. I was just asking you if that last sentence of that paragraph then pulls back on that contention and says, in any event, we also decline to narrowly read this passage as only supporting exclusion of through holes from the sidewalls. That's how I was reading it, and that's why I was asking for your perspective. It might. It might, but when they talk about KSR and they talk about not being an automaton, then it seems more clear to me that they're talking about 103, and so we're back to that being the motivation to modify NAH as opposed to an express disclosure that it's just disclosed. I understand your point, and I agree it could, but it also suggests, and I think reinforces our point, that it's a 103, and they didn't provide, they said supports position to position. I think what they meant is provides a motivation to modify. They just didn't say it, and we have no evidence that they considered anything else. That's all I have on NAH. I'd like to move to secondary considerations if I can. Okay, so the secondary consideration, same issue, that they didn't consider the totality of the evidence. That's our argument. I think it's correct, and it leads to evidentiary findings that don't have substantial evidence support. So I'd like to start with a stony email, which is the email that Samsung sent our inventor, and what was said in that was indoor spaces, I'm sorry, I see lots of opportunities for collaboration in indoor spaces where we can embrace the MRI technology and blend it in with Samsung displays. The board's finding, and the board's finding is at appendix 55 on this, the board finds that that is related to a business model. That finding, I don't think, is supported by the evidence. He says outdoor display, or outdoor spaces, he talks about embracing technology, he talks about blending it in with the displays. Now, it doesn't say exactly what the technology is, but I still think the finding of the board is not supported by substantial evidence. The question is, how do we know what the technology is that he's speaking of? And so we rely on Richardson-Vicks for the proposition that you have to look at the record in its entirety, and so what we rely on is the Samsung teardown. So the board notes at appendix 48 through 49 that Samsung purchased our displays, and they did a competitive teardown where they tested at least the thermal properties. Do I remember correctly that they also said that at the time of that teardown, Samsung's device already existed? Yeah, they did say that. That's a finding, and that's not really germane to the argument today, although it's in our briefing. That was how they found it wasn't copying or concluded it wasn't copying. My point is a little bit different point, that they didn't look at the evidence in its entirety, and so when Mr. Stone tells our inventor, you're doing great, we'd like to take this technology and put it in our displays, you don't know from that email, without looking at anything else, which is the position that the board took and the position that PTO endorses, you don't know what that's about necessarily. You have to look at the totality of the evidence. The way we fill that gap is with the teardown, and what we showed in the teardown, this is at 4593, is the Samsung displays have a constricted convection channel. They use a different word, it's in our brief, but it's redacted because it's considered confidential, but the second word is a convection channel, the first word is a synonym for constricted. So they had a constricted convection channel. They had the same thing, so now we know what Stone is talking about, but if you don't look at the evidence, you don't know that, you can't tell. And then, so now we've established a nexus, so now we move on from that. What else do we know? Well, we introduced Mr. Palmer's testimony. What Mr. Palmer said, and actually we both cited Mr. Palmer's testimony, he said, Samsung displays are great. It's a great company, great reputation. We don't contest that. He also said that Samsung displays work in hot and cold weather. That was the finding that the board set out in their decision. What they didn't set out in the very next statement, where Mr. Palmer said, Samsung displays, one of the reasons they're great is because they work in hot weather and the competitive displays don't. They fail. I think he used the word blotchy or splotchy, right? So he is, his testimony, again, he sells them. He doesn't know what's in them. So he provides testimony that says, that's the differentiator. So now, if you take his testimony and put it back to the teardown, you have the nexus. And then the final point we made as to commercial success, so we know it makes a difference. We know that it's tied to the claimed invention. Now, does it make a difference in the market? And so if you turn, if you look at our brief, if I can get these pages to turn, so we look in our patent owner response, we talked about the commercial success. This is Appendix 772. We talk about this in our brief at 18, but in the prior displays that did not have the constricted convection channel, we noted that they sold $5 million in the US for several years before they adopted the infringing constricted convection channel. In the year after they introduced the constricted convection channel, the sales... The time is running out, and we have the record, and we've got numerous secondary considerations issues. I'd like you to just take a minute before your time runs out to address Claim 8, the dependent claim. And I think I can do it in less than a minute. There's two issues with that. The first one is that the board's construction, the PTO's arguments read out access. So there's three types of apertures. There's entry, exit, and access. And so according to the board's construction, the access aperture is just let air in. That's not consistent with the spec or with the arguments we made. And also have an argument aside from the claim construction argument that the board was inconsistent in its analysis with respect to Claim 1 as compared to Claim 8. Claim 4, yes, Your Honor. And we use the term nonsensical because for Claim 4, they said that the modified version of NAW meets the constricted convection channel limitation. But it has to be without the through holes. That's on 34. And then it's appendix 66 where they incorporate that into Claim 4. But then when they go to Claim 8, they put the holes back and say as long as they let air in, they're access, they're access for air. Well, those two holdings are not, you can't put those together. They don't make any sense together. They didn't put that combination together until the final written decision. So we were, our presumption was either they would find that you didn't have holes and Claim 8 would be allowable or they'd find you do have holes and so they're all allowable. But somehow they, unfortunately, put the two together. And so for that reason, it should be vacated as well, especially to that claim. And so I'll reserve the rest of my time for rebuttal. Yeah, thank you. My minute. May it please the Court. I just wanted to clear up something when it came to the NAW reference. I think just going back to the beginning of the conversation, there's a question about whether the Court, or whether the Board, was trying to modify the reference itself in like a 103 sense. And that's not, that's not what the Board was doing. So we can look back at the appendix. I think 38 was the appendix page that we were talking about. So the reason why the word modification is used in the Board's decision is because Samsung had prepared a modified version of figure two that encompasses the embodiment that we've sort of been talking about here. And that's, at appendix 31, you can see that this is sort of the modified picture of figure two and they call it figure two modified. Is that, see how it says exhibits below that sentence on page 38? It says exhibit 1002, 1010. Are either of those referring to what you're talking about? Modified figure? It's actually reproduced. It may be easier to see on appendix 31 because it's reproduced. I can see that. I was just asking if those exhibits have anything to do with it, but I don't think they do. Okay. I think, yeah, I think it was prepared by the expert. So that might be 1002, 210. But in any event, that's what the modification is talking about. It's not talking about like a 103 modification. And the sentence, I think, that should lay this to rest is at the top of appendix 38, we find that an ordinarily skilled artisan would have known, based on the passage, to form or not form through holes in bottom plate and side walls. I think what you're saying is the second thing that I said about modification. The first thing was the word may be wrong now. And then the second thing was, well, actually, the word is not wrong. It was the modification of a particular drawing, a figure, in Na that was being discussed. Exactly, yes. A modification of that figure that is expressly taught by that pair of sentences. Exactly, yes. Could you just deal briefly with claim eight and the tension that your friend identified? Not with respect to the construction. Not the claim construction. Okay. So this is sort of a strange argument because MRI's arguments in the whole record below the board was that the independent claims cannot have holes in the constricted convection plate. That was their lead argument for the independent claims. And for dependent claim eight, their argument is the plate needs to have holes in it. So their arguments were that... Can I interrupt you for a minute because this is something that's bothering me too. So I want to just, in response to what you're saying, I hear what you're saying, but what if it's the nature of the size of the holes and what they let through? That's what their argument is, is the nature of the size of the holes. So bearing that in mind, I don't know that I think their position is inconsistent. My concern is that the board's might be. So why is the board's position inconsistent? Well, I'm not sure if I would agree that that was MRI's argument. They argued that apertures are holes that only allow certain things through, being the wiring, right? And in NAAH, where in the embodiment where there's holes, air goes through the holes. That's what you see in the figures in NAAH. So I was just concerned because when I looked at the analysis from the board, it seemed like in the way that the board's looking at those holes in NAAH, it might be inconsistent as opposed to how the holes are in the specification of the patents too. You see the difference? Well, Your Honor, that argument is more of, that sort of goes back to claim construction because the claim construction argument is about the nature of the access, whether it's access to air or access to wiring or other hardware. And so that was sort of the claim construction issue that MRI was arguing below. The problem with this, the way this has kind of come up, one, we do believe that MRI forfeited this sort of argument that there's an inconsistency between the board's analysis for the independent claims and the dependent claims. These embodiments for the independent claims, Samsung argued throughout its papers that there were two potential embodiments of NAAH that could cover Claim 1. One embodiment where there are holes in the constricted convection plate and another embodiment where the holes are in the cycle. Who just relied on the definition of convection plate as being the one without holes, right? The board relied on the second alternate, which is, yes, the embodiment where there are holes. So how do you get to Claim 8 where we're talking about the constricted convection plate being with holes? I mean, there is an inconsistency there. I mean, there does appear to be an inconsistency there from the board's decision. I'm sorry. Why do you call that an inconsistency? NAAH teaches two things. I think the board... Did the board really reach the issue? I mean, I don't think the board concluded and this definition can't include with holes. Maybe it did. The board's focus was on the second embodiment of NAAH with holes in the sidewalls. The board did discuss both the embodiments that Samsung presented, including the embodiment that had holes in the plate and the embodiment that did not have holes in the plate. So the board treated both of them in the independent claims. But they focused on the second embodiment because MRI was arguing that the constricted convection plate of Claim 1 could not have holes. It was a Swiss cheese approach. That was their argument all below and in front of the board. So you think the board's analysis was a result of the debate that was going on before it. Exactly. How would, I mean, if we were to conclude this was kind of harmless error or whatever, we would conclude that the board in its definition included with holes and without holes? Yes. And I think Mr. Almani said that I guess it was in the board's discussion of Claim 1 that it was only the with holes embodiment of NA that allowed the other requirements to be met. Or maybe that was Claim 4. I don't remember. I didn't remember the board saying that. I thought the board said NA kind of teaches both things. We don't need to consider whether the requirement that was at issue, I think, about basically getting the convection, the heat to be actually removed, could work with the one because it does definitely work with the other. So one is sufficient. Right. And it didn't say the other is not sufficient. Correct. That would be potentially an inconsistency. Correct. But I don't remember the board saying that. Yes, Your Honor, the board did not disparage the first embodiment of NA. In fact, Appendix 39, I think maybe makes this point. On the top, it says that this is for the related term, the constricted convection channel. But it does say, based on these teachings, we are persuaded by petitioner's contention that an ordinarily skilled artisan would have understood that the bottom plate 210 constricts airflow in order to achieve the desired convective cooling effect, and then goes on. This is particularly true given that petitioner's proposed modification to not include holes 212 in bottom plate 210 based on NA's teaching. So there's both of the embodiments of NA are referenced in that section of the boards. And indeed one could, in the absence of some other reason to think otherwise, understand the rejection of the argument made about NA, whether the hold version or the not hold version, but it's particularly clear in the not hold version. That's right, yes. I guess I can briefly talk about secondary considerations. I'd like to point out a couple things. One, on the praise. My friend referred to an email from Stowian, it's appendix 3568, and I just want to reiterate, I believe he admitted that the email does not say what the technology is. And I think that is a clear reason to show lack of nexus if the evidence that's relied on to show praise does not identify the technology. Did the board make that point in its analysis? Yes, the board did look at the... This is praise. This is the appendix 55, yes, this is the part where the board discusses the email and it basically says that it talks about a business model and not about... I believe I heard a new argument which is to kind of fill the gap. I think my friend used the word gap to describe the email, not talking about the technology. To fill this gap, they're sort of trying to shoehorn in the tear down evidence. And I do not remember seeing this argument in their briefing anywhere. If they want to rebut that, that's fine, but I did not see that explicitly trying to tie the tear down, a part of the tear down analysis with this email. I don't think that they're linked in any way. For what it's worth, I think it's a new argument, not briefed. The next thing was the Palmer email. Had appendix... It was 4506 and discussed an appendix 55 in the same place in the board's decision. And again, I believe I heard an admission that the Palmer email by itself does not talk about the claimed invention here, the constricted convection plate. And again, there was an attempt to shoehorn this tear down evidence into this email from Mr. Palmer. And I did not see that argument in their briefing to this court. If I'm wrong, then perhaps they can correct me. In any event, there's no link between one email and a tear down. I don't understand how the two things could be viewed in combination unless there's some kind of link between the two. We have additional evidence regarding no presumption of nexus that maybe I could just mention once, quickly, since I have time. It's important for the secondary considerations just to note that MRI... It argues that it has a presumption of nexus. It admits, I think, on page nine of its gray brief that there are additional unclaimed features to the claimed invention, but it does not analyze any of those admittedly existing unclaimed features. So there's no presumption of nexus either that could help them tie their secondary considerations to the claimed invention. Any questions from the court? Thank you. Thank you. Try to use my 59 seconds wisely. I'll give you five minutes. It's okay. I think I can get this quickly. Okay. So the argument about the flood claim and the argument that we made. So the argument we made in the patent on a response at appendix 762 and 763 and then throughout oral argument, for instance, appendix 967 and 968 is that you can have holes in the back, but those holes cannot disrupt the airflow. So if they disrupt the airflow, then you plug them. In the specification, it talks about the fact that you can have the access apertures, but you don't want them to disrupt the flow of the air across the back. So we make that argument consistently. I agree that the board didn't address it, but we have made that argument consistently. That's how the access apertures are different than an entry aperture or an exit aperture. So the PTO is doing the very thing that we complained about the board doing. They're endorsing the idea that if you look at secondary considerations, you look at an email, and then you look at something else, and you just ignore the fact that the email happened. That's not consistent with the law, which requires that you look at the totality of the evidence, and in a case like this where it's on the papers, so we're submitting various different types of evidence, our argument is that they incorporated our technology and then you have evidence that they appreciated. Mr. Palmer sells Samsung displays. He doesn't tear them down. He doesn't go inside of them. How would he know what's inside? He just knows they work better. So our burden, which we met, is to go and show that they have the claim to mention. So yes, I admitted it. I admitted that the email doesn't say constricted convection channel. It would be surprising if it did. But the policy issue here is that I don't know how on papers you'd ever prove nexus if you're required for every document that you submit to the patent office to have every detail about the claim to mention. That's just not how the evidence works. And I think with that, unless you have further questions, I'll... Thank you. Thank you very much. Thank you, Your Honor. Both sides in the case are submitted.